691 So.2d 824 (1997)
Billy Joe JACKSON, Plaintiff-Appellant/Appellee,
v.
CREGER AUTOMOTIVE CO., INC., Defendant-Appellee/Appellant.
No. 29249-WCA.
Court of Appeal of Louisiana, Second Circuit.
April 2, 1997.
Rehearing Denied May 1, 1997.
*826 Law Offices of Jack M. Bailey, Jr. by J. Allen Cooper, Jr., for Plaintiff-Appellant/Appellee Billy Joe Jackson.
W. Michael Stemmans, Baton Rouge, for Defendant-Appellee/Appellant Creger Automotive.
Before NORRIS, STEWART and CARAWAY, JJ.
NORRIS, Judge.
The claimant, Billy Joe Jackson, appeals a decree of the Office of Worker's Compensation ("OWC") which refused to reinstate Jackson's supplemental earnings benefits ("SEB"), and denied penalties and attorney fees. His employer, Creger Automotive Co., Inc., ("Creger") answers the appeal, contesting finding of a work-related injury to Jackson's knee and back, and requesting a credit for overpayment of benefits. For the following reasons, we affirm in part, reverse in part and remand.

Factual background
Jackson, an automobile suspension chassis specialist, was employed with Creger as the assistant manager and a service technician. His responsibilities included booking, assigning, performing, and supervising service jobs. While at work on April 3, 1990, Jackson climbed up to a car that was on a service rack to read its model and serial number for ordering parts. As he turned to get off, he slipped and fell into the pit below the rack. Jackson initially landed on his feet, thereby twisting his right ankle and knee before coming to rest on his back. He felt a "sharp, tremendous" pain in his leg. Jackson claimed that he never had any prior back, hip or knee injuries other than when he was in high school or any prior on-the-job injury.
*827 When Jackson telephoned his wife to report the injury, she asked that he come home. However, the service manager was out sick that day, and Jackson decided to remain at work. When he returned to his home in Bossier City that evening, his right leg and foot were swollen. Mrs. Jackson took her husband to Bossier Medical Center, where the attending staff took x-rays of his leg and foot, prescribed some pain relief medication, and referred him to see Dr. Clinton McAlister, an orthopedic surgeon. Dr. McAlister in turn referred Jackson to Dr. Thomas Edwards for treatment of his knee.
Dr. Edwards performed surgery on Jackson's knee on May 15, 1990. Dr. Edwards performed "an arthroscopically aided anterior cruciate ligament ("ACL") reconstruction, medial and lateral meniscectomies arthroscopically and debridement of his lateral compartment." Dr. Edwards opined that Jackson was limited in his ability to stand, walk, stoop, bend, squat, and work on hard surfaces because of his knee injury. He concluded that Jackson was unable to return to his job as a service technician because it required standing. Dr. Edwards assigned a 50% permanent partial disability of Jackson's right leg.
In December of 1990, Jackson also reported back pain for the first time to Dr. Edwards, who referred him to Dr. Carl Goodman for examination in July of 1991. Dr. Goodman's diagnosis was degenerative lumbar disc disease with radiculitis on the left. He recommended non-operative care, with an MRI and surgery if radicular symptoms increased. Dr. Goodman did not believe Jackson injured his back in the fall at Creger, but thought the use of crutches as a result of the knee surgery possibly caused the back problem. Because Jackson was displeased with his treatment under Dr. Goodman, Dr. Edwards referred him to Dr. Marcos Ramos. Jackson initially saw Dr. Ramos in August of 1993. Dr. Ramos requested an MRI of the lumbar spine, but Creger refused to authorize the procedure.
At the time his work-related injury, Jackson earned an average of $450 per week at Creger. The company therefore paid him maximum temporary total disability ("TTD") benefits of $276 per week from April 6, 1990, through June 11, 1992. Thereafter, Creger reduced the benefits to SEB because of Jackson's alleged failure to report his correct earnings as a pastor to Susan Mack, a representative of the Claims Center, Creger's adjustor, and because of jobs allegedly available to him identified by General Rehabilitation and Glenn-Mar, rehabilitation companies retained by Creger. The Claims Center learned in early 1992 that Jackson was serving as pastor at the United Pentecostal Church of Pittsburg, Texas, and claimed that he continuously neglected or failed to report his wages and other earnings from this job. Creger paid SEB at the weekly rate of $186.67 from June 12, 1992 until August 19, 1993. Thereafter, Creger terminated Jackson's benefits because of his alleged failure to correctly report his earnings as pastor and because it believed there were jobs available to Jackson enabling him to earn 90% of his pre-injury wage.
On September 24, 1993, Jackson filed the instant claim with the OWC. Jackson alleged that Creger failed to pay indemnity and medical benefits and requested penalties and attorney fees. The OWC conducted a hearing on Jackson's claim on May 1, 1995, and July 13 and 14, 1995.

Action of the hearing officer
On September 25, 1995, the hearing officer issued a decree finding that Jackson injured his knee "while in the course and scope of his employment" with Creger. She determined that Jackson's back complaints were workrelated and that he was entitled to an MRI. However, she stated that Creger had properly reduced Jackson's TTD benefits to SEB because of his failure to report his earnings as pastor. The hearing officer further determined that Jackson had chosen to work as a pastor, although there were other jobs and rehabilitation by retraining available to him. Thus, she concluded that with regard to SEB, Jackson was voluntarily earning less than 90% of his pre-injury wages, also justifying the termination of benefits. Finally, the hearing officer denied Jackson's claim for penalties and attorney fees. Jackson has appealed, advancing five assignments of error. *828 Creger has answered, also advancing five assignments of error.

Applicable law
A claimant who suffers "personal injury by accident arising out of and in the course of his employment" is entitled to compensation benefits. La.R.S. 23:1031 A. A work-related accident is "an unexpected or unforseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration." La.R.S. 23:1021(1). An employee's preexisting disease or infirmity does not disqualify his workers' compensation claim if the workrelated injury either aggravated or combined with, the disease or infirmity to produce the disability for which compensation is claimed. Andrews v. Music Mountain Water Co., 25,634 (La.App.2d Cir. 4/6/94), 637 So.2d 571, writ denied, 94-1190 (La. 6/24/94), 640 So.2d 1356.
The claimant in the worker compensation case has the burden of proving a workrelated accident by a preponderance of the evidence. Bruno v. Harbert Int'l Inc., 593 So.2d 357 (La.1992); Chitman v. Davison Trucking, 28,073 (La.App.2d Cir. 2/28/96), 669 So.2d 671. Proof by a preponderance of the evidence is sufficient when the evidence, taken as a whole, shows that the fact sought to be proved is more probable than not. Chitman v. Davison Trucking, supra.
In determining whether the worker has discharged the burden of proof, the trier of fact should accept as true a witness's uncontradicted testimony, although the witness is a party, absent circumstances casting suspicion on the reliability of his testimony. A worker's testimony alone may be sufficient to discharge the burden provided that two essential elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker's version of the incident, and (2) the worker's testimony is corroborated by the circumstances following the incident. Bruno v. Harbert Int'l Inc., supra; Chitman v. Davison Trucking, supra. A claimant's own, uncontradicted testimony corroborated by medical evidence may prove a work-related accident. Shelton v. Wall, 614 So.2d 828 (La.App.2d Cir.1993).
In the event of a work-related injury, the employee bears the initial burden of establishing the causal connection between the disability and the employment accident by a reasonable preponderance of the evidence. The claimant does not necessarily have to establish the exact cause of the disability, but he must demonstrate by a preponderance of proof that the accident had a causal connection with the disability. The causal relationship can be established when the employee proves that before the accident he was in good health, but commencing with the accident the symptoms of the disabling condition appeared, and there is sufficient medical evidence to show a reasonable possibility of causal connection between the accident and the disabling condition. Quinones v. USF & G, 93-1648 (La. 1/14/94), 630 So.2d 1303; Allen v. Misco Paper, 27,146 (La. App.2d Cir. 8/23/95), 660 So.2d 175.
The employer is obligated to furnish all necessary drugs, supplies, hospital care and services, medical and surgical treatment, and any nonmedical treatment recognized by the laws of the State as legal for a compensable injury. La.R.S. 23:1203 A. The worker claiming medical benefits must prove by a preponderance of the evidence the necessity and relationship of the treatment to the work-related accident. Chitman v. Davison Trucking, supra.
For injuries leaving the employee unable to earn 90% of his pre-injury wage, La.R.S. 23:1221(3) authorizes SEB:
(3) Supplemental earnings benefits.
(a) For injury resulting in the employee's inability to earn wages equal to ninety per cent or more of wages at time of injury, supplemental earnings benefits equal to sixty-six and two-thirds percent of the difference between the average monthly wages at time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment, whether or not the same *829 or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience[.] ...
(b) For purposes of Subparagraph (3)(a), of this Paragraph, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sums actually received by the employee, including, but not limited to, earnings from odd-lot employment, sheltered employment, and employment while working in any pain.
(c)(i) [F]or purposes of Subparagraph (a) of this Paragraph, if the employee is not engaged in any employment or selfemployment,... or is earning wages less than the employee is able to earn, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sum the employee would have earned in any employment or self-employment ... which he was physically able to perform, and (1) which he was offered or tendered by the employer or any other employer, or (2) which is proven available to the employee in the employee's or employer's community or reasonable geographic region.
(ii) For purposes of Subsubparagraph (i) of this Subparagraph, if the employee establishes by clear and convincing evidence, unaided by any presumption of disability, that solely as a consequence of substantial pain, the employee cannot perform employment offered, tendered, or otherwise proven to be available to him, the employee shall be deemed incapable of performing such employment.
An employer is entitled to deduct the amount of any previous voluntary overpayment of benefits to the employee from future payments to be made as compensation. La. R.S. 23:1206; Jim Walter Homes v. Lewis, 544 So.2d 485 (La.App.2d Cir.1989) (on rehearing).
The hearing officer's factual findings are subject to the manifest error rule. Alexander v. Pellerin Marble & Granite, 93-1698 (La. 1/14/94), 630 So.2d 706; Mitchell v. AT & T, 27,290 (La.App.2d Cir. 8/28/95), 660 So.2d 204, writ denied, 95-2474 (La. 12/15/95), 664 So.2d 456. Under the manifest error rule, the reviewing court does not decide whether the factual findings are right or wrong, but whether they are reasonable. Stobart v. State, Through Dept. of Transp. & Dev., 617 So.2d 880 (La.1993); Graham v. Georgia-Pacific Corp., 26,165 (La.App.2d Cir. 9/23/94), 643 So.2d 352. Reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d 840 (La.1989); Mitchell v. AT & T, supra.
The employer or its insurer must pay benefits within 14 days of notice of injury; failure to pay timely subjects the liable party to a penalty of 12 percent, unless "the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control." La.R.S. 23:1201. In addition, La.R.S. 23:1201.2 provides for an award of attorney fees when the employer or insurer arbitrarily and capriciously discontinues payment of comp claims. This provision is penal in nature and must be strictly construed, allowing recovery only when the facts of the case negate probable cause for nonpayment. The hearing officer has great discretion in deciding whether to allow or disallow attorney fees. Stevens v. Wal-Mart Stores, Inc., 27,977 (La.App.2d Cir. 11/1/95), 663 So.2d 543.

Discussion: Work-related accident
We begin with Creger's claim that the hearing officer erred in finding that Jackson suffered a work-related accident. Creger cites inconsistencies in the testimony of Jackson and his wife and in several medical reports as to when and how the alleged accident occurred. Creger also notes that there were no witnesses to the event.
The evidence of injury consists primarily of Jackson's own testimony, the testimony of Mrs. Jackson, and medical reports. Jackson stated the he slipped and fell after climbing on a car rack to check the model and serial number of a vehicle. We do not find Jackson's account of the incident so dissimilar to that of other evidence as Creger contends.
*830 The employer's report of injury, prepared by Creger supervisor John Turner, stated that accident occurred when Jackson slipped of the rack while attempting to acquire the mileage of the vehicle, an immaterial discrepancy. Other minor differences with no bearing on Jackson's credibility appeared in the Bossier Medical Center report ("history of stepping off a step") and Dr. McAlister's deposition ("history of having his foot slip when he fell").
Creger also attempts to discredit Jackson's testimony by pointing out discrepancies as to the time of the incident. Jackson testified that the accident occurred at approximately 11:45 a.m., but Creger's report of injury states that the incident occurred at 12:30 p.m. Further, Creger argues that Mrs. Jackson testified that her husband called her from work before lunch between 10:00 and 11:00 a.m. and that he indicated the accident had already occurred. Again, we view these as trivial inconsistencies in the evidence and not significant enough to discredit Jackson's testimony on this issue.
Jackson's claim of a work-related injury was further corroborated by medical evidence and testimony from Mrs. Jackson. Jackson reported to the Bossier Medical Center on the evening of his fall for aid to his right ankle and lower leg. Jackson followed with treatment from Drs. McAlister and Edwards. Dr. McAlister treated Jackson from April 6 through May 9, 1990. His exam revealed swelling and blood in Jackson's right knee joint. Dr. McAlister opined that such symptoms were consistent with Jackson's history of a recent fall. On April 20, 1990, Jackson began treatment with Dr. Edwards, who indicated that Jackson's ACL tear resulted from his fall.
Mrs. Jackson testified that her husband called to report the fall and described it as "pretty bad." When Jackson arrived home that evening, she had to assist him from his truck because of the swelling in his leg and foot. Mrs. Jackson convinced her husband to let her take him to the hospital and accompanied him to several of his doctor appointments. She also stated that before the fall, Jackson was active and healthy and had no physical restrictions. However, after the accident Mrs. Jackson noted a decrease in his activities and testified that Jackson still suffered pain in his back and knee.
Finally, Creger notes that when Jackson began treatment with Dr. McAlister, he reported the date of his injury on the patient information form as "2/3/90." Creger argues that such a statement further supports its contention that no work-related accident occurred. Again, we disagree and consider this date nothing more than a minor error on Jackson's part in preparing a lengthy form. Our conclusion is further supported by Dr. McAlister's testimony that he had to aspirate bloody fluid from Jackson's knee at his initial treatment of April 6. Dr. McAlister stated that the presence of such fluid was more consistent with the injury occurring on April 3 rather than February 3.
Although there were slight differences between Jackson's testimony and other evidence, the hearing officer obviously found his testimony of a work-related accident to be credible. Determining credibility is the function of the trier of fact. Bruno v. Harbert Int'l Inc., supra. Having reviewed the testimony of Mr. and Mrs. Jackson and the significant amount of corroborating medical evidence, we conclude that the hearing officer was not manifestly erroneous in finding that Jackson sustained a work-related accident on April 3,1990.

Knee and back injuries
We next turn to Creger's claim that Jackson failed to present sufficient medical evidence to establish that his knee and back injuries were causally related to his workrelated accident. Creger notes that Jackson had prior history of knee injury as evidenced by his own testimony, by Dr. McAlister's report, and by Dr. Edwards's testimony. Jackson, 58 years old at the time of hearing, testified that he had minor knee injuries from "high school bouncing around." Dr. McAlister noted that Jackson had "old history of injuries to his knees." Also, Dr. Edwards stated that Jackson indicated that he had occasional soreness in knees resulting from playing ball in high school.
*831 We conclude that the testimony of Mr. and Mrs. Jackson and the significant medical evidence supports a finding that Jackson's knee injury resulted from his fall at Creger. There is a long time lapse between Jackson's minor knee problems in high school and the much more severe current knee injury he suffered from the fall. Accordingly, we find no error in the hearing officer's conclusion that Jackson suffered a work-related injury to his knee.
As to Jackson's back injury, Creger argues that Jackson did not complain of a back injury until December 1990, approximately eight months after the accident. Creger also points out that the medical testimony and reports corroborate this date. The Bossier City Medical Center emergency room report does not reveal that Jackson complained of a back injury. Dr. McAlister stated that there was no indication from Jackson that he injured his back in the fall. Further, on subsequent visits of April 11 and 20 and May 9, Jackson never reported back injury or back pain.
Dr. Edwards confirmed that in Jackson's patient information form, he did not mention any back injury. He stated that Jackson did not complain of back pain until December of 1990. However, Dr. Edwards, who did not treat Jackson's back, noted that Jackson's change of gait and his use of crutches following his knee surgery could possibly cause Jackson's back problems, especially in light of his age.
Jackson received treatment from Dr. Carl Goodman for his back pain beginning in July of 1991. Dr. Goodman, who was not deposed and did not testify at the hearing, stated in a report dated July 2, 1991, that Jackson's back problem was "[d]egenerative lumbar disc disease with radiculitis on the left." He recommended therapy in the form of walking and opined that Jackson would have chronic back problems. Jackson treated with Dr. Goodman again on August 13, 1992, complaining of increased back pain. Dr. Goodman's impression remained the same, although he did rule out disc herniation on this visit. He continued his recommendation of nonoperative care, indicating the need for an MRI and surgery only if Jackson's radicular symptoms increased.
In a letter of October 9, 1992, to Claims Center representative Susan Mack, Dr. Goodman stated:
Your question whether Mr. Jackson's complaints of back pain are related to his workers' compensation claim is difficult to answer. I feel like he developed back pain following his knee injury, and could possibly relate it to having to walk on crutches without the use of his injured leg. I do not think he injured his back in the initial fall. (Emphasis added.)
Displeased with his treatment with Dr. Goodman, Jackson later saw Dr. Marco Ramos, a neurosurgeon, in August of 1993. Dr. Ramos, who also was not deposed and did not testify at the hearing, stated in his initial evaluation report that Jackson had "manifestations of lumbosacral radiculopathy" and recommended an MRI of the lumbar spine to determine treatment.
We recognize Jackson's delay in reporting back pain. However, Drs. Edwards and Goodman attested to the reasonable possibility that Jackson's back pain was the result of his change of gait and use of crutches following his knee surgery. Also, Dr. Ramos confirmed that Jackson sustained a back injury. Further, Mrs. Jackson testified that her husband began complaining of back pain after he had recovered from the effects of his knee surgery. While Jackson's knee injury was the primary source of pain, we note that he did land on his back when he fell at Creger. Once the pain in his knee subsided, he began experiencing back pain. Such an injury is attributable to his change in gait and having to use crutches. In light of these factors, we find no manifest error in the hearing officer's conclusion that Jackson suffered a work-related back injury.

MRI
Having determined that the hearing officer was not manifestly erroneous in concluding that Jackson's back complaints were work-related, we only consider whether the MRI was medically necessary. Chitman v. Davison Trucking, supra. Dr. Goodman recommended this procedure if Jackson's *832 symptoms persisted; further, Dr. Ramos stated it was necessary to determine the course of treatment for Jackson's back injury. Jackson testified that the symptoms persisted, and his wife corroborated this testimony. Thus, Jackson has proven the necessity of such a procedure, and Creger is obligated to pay for it. Chitman v. Davison Trucking, supra. Accordingly, we also affirm this portion of the decree.

Supplemental earnings benefits
We next turn to those assignments concerning the termination of SEB. Jackson submits that the hearing officer erred in failing to award him SEB because Creger did not show that a job was available in his reasonable geographical region which he could physically perform and would pay 90% or more of his pre-injury wage. Jackson further claims that the hearing officer erred in finding that he was voluntarily underemployed based upon his position as pastor. He argues that because none of the jobs Creger allegedly proved "available" paid 90% of his pre-injury wage, he would have to reenter the job market at minimum wage. Thus, Jackson contends that if he was voluntarily underemployed as a pastor rather than performing the minimum wage jobs, he should receive SEB with a minimum wage "offset."
In support of his position that he was entitled to SEB, Jackson disputes the testimony of Mark Cheairs, Creger's vocational rehabilitation expert, as to those jobs identified as suitable. He further notes that Dr. Edwards, while approving several job descriptions Cheairs submitted, testified that the job description forms were not valid or accurate. In addition, Jackson alleges that the hearing officer failed to consider his back injury in evaluating his ability to work. Jackson argues that the evidence showed he has physically struggled to serve as pastor of the small church, with the help of his wife, and that he would unlikely be able to serve a larger church. Accordingly, Jackson submits that this factor supports his argument that he is incapable of earning 90% of his preinjury wage.
Jackson has only a tenth grade formal education and completed his GED in 1957 while serving in the Navy. Dr. Edwards opined that because of Jackson's knee injury, he was restricted to sedentary work and could not return to his job as a service technician. Charles Creger, owner of Creger Automotive, testified that even the job at his company with the lightest duty required walking and that he could not employ Jackson. Accordingly, Creger hired Mr. Cheairs, a vocational rehabilitation consultant, to assist Jackson in finding a new job.
Mr. Cheairs presented a list of job positions for Jackson approved by Dr. Edwards that were located in the Shreveport area. These jobs included cashier, counter clerk, telemarketer, office clerk, customer service representative, dispatcher, receptionist, and clerical assistant. The evidence as to whether Jackson could perform all of these jobs is seriously contested. However, we can not say that the hearing officer was clearly wrong in concluding that there were minimum-wage jobs of a sedentary nature available that Jackson could physically perform. While we do not fault Jackson for assuming pastoral work, in view of his "calling," his training, his commitment to the church's growth, and his sincerity in serving the church with his wife's assistance, we must find that he could indeed have earned minimum wage at various sedentary jobs.
We do, however, find that Creger failed to show that any of the available, suitable jobs allowed Jackson to earn 90% of his preinjury wage. In fact, the positions available to Jackson paid only minimum wage. La. R.S. 23:1221(3)(c)(i) states that in determining SEB, when an employee "is earning wages less than the employee is able to earn, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sum the employee would have earned in any employment or self-employment[.]" (Emphasis added.) The statute does not provide for termination of SEB when an employee is voluntarily underemployed; instead, it provides for SEB in an amount based upon what the employee could have earned.
*833 Accordingly, although Jackson is underemployed as a pastor, he could have earned minimum wage in those jobs available to him and is entitled to SEB based upon such an amount. Therefore, we order SEB payments reinstated retroactive to the date of their termination. We note that in some months, Jackson has received higher monthly earnings than he possibly could have made at the minimum wage jobs. Thus, we remand this matter to the OWC for a calculation of unpaid SEB based on either the minimum wage, which he is able to earn, or his actual earnings as a pastor, whichever is greater. La.R.S. 23:1221(3)(b). Future payments of SEB shall also be calculated on the same basis established by § 1221(3)(b).

Penalties and attorney fees
Jackson also contends that the hearing officer erred in failing to award penalties and attorney fees. Even in light of our reversal of the hearing officer's decree as to the termination of SEB, we can not say that Creger was arbitrary and capricious in discontinuing payment of Jackson's comp benefits. The instant record reveals factual disputes as to Jackson's entitlement to benefits. Accordingly, we decline to disturb the hearing officer's refusal to award penalties and fees.

Creger's claim for credit or offset
Creger claims that it is due credit or offset for its overpayments of TTD and SEB to Jackson while he was working and earning wages as pastor. All payments were voluntary, and not made pursuant to OWC decree. The credit for overpayment of these benefits applies to any payment "to be made as compensation." La.R.S. 23:1206. For the reasons already discussed, this court is reinstating Jackson's SEB and making them retroactive to the date of termination. As this award is a payment to be made as compensation, the credit for any overpayments found by the hearing officer, on remand, to have been made by Creger will be allowed.[1]
Thus, the hearing officer can determine the amount of overpayment, if any, and give credit accordingly against all payments due Jackson as compensation.

Alleged violation of La.R.S. 23:1208 A
Creger also urges that Jackson has forfeited all benefits pursuant to La.R.S. 23:1208. This provision makes it unlawful for a claimant to willfully make a false statement or representation for the purpose of obtaining benefits. Subsection E of the statute provides for forfeiture of comp benefits upon determination of a violation by the hearing officer. Creger submits that there was substantial evidence produced at the hearing that Jackson made material misrepresentations to Creger, his physicians, and the Claims Center.
The hearing officer's decree and accompanying reasons do not mention the forfeiture of benefits under § 1208 despite Creger having pled the same in its first amending and supplemental answer. The hearing officer's silence on this point amounts to a rejection of the claim. Bamberg v. City of Shreveport, 26,278 (La.App.2d Cir. 12/7/94), 647 So.2d 1207, writ denied, 95-0414 (La. 3/30/95), 651 So.2d 845; Johns v. American Isuzu Motors, Inc., 622 So.2d 1208 (La.App.2d Cir.1993). Accordingly, for this reason and in light of our decision that Jackson is entitled to SEB, this claim is without merit.

Conclusion
For the foregoing reasons, we affirm that portion of the hearing officer's decree finding that Jackson suffered a work-related accident causing injury to his knee and back and entitling him to an MRI of his back. We further affirm the decree insofar as it found Jackson to be underemployed. We reverse that portion of the hearing officer's decree denying Jackson further SEB and reinstate his SEB retroactive to the date of Creger's termination of these benefits, and subject to *834 the credit of La.R.S. 23:1206 for any voluntary overpayment of benefits. We remand for further proceedings consistent with this opinion to determine the amount of such benefits, and credits for overpayment, if any. Costs of this appeal are assessed to Creger Automotive Co., Inc.
AFFIRMED IN PART; REVERSED IN PART AND REMANDED.

APPLICATION FOR REHEARING
Before NORRIS, BROWN, STEWART, CARAWAY and PEATROSS, JJ.
Rehearing denied.
NOTES
[1] We note, however, that if the claimant was found to be unentitled to benefits, a reimbursement claim by Creger for prior overpayments would not be within the OWC's jurisdiction. See Rivera v. West Jefferson Medical Ctr., 96-152 (La. App. 5th Cir. 7/30/96), 678 So.2d 602; Sumrall v. Luhr Bros., 95-0079 (La.App. 1st Cir. 12/15/95), 665 So.2d 796, writ denied, 96-0187 (La. 3/15/96), 669 So.2d 425; Cajun Bag and Supply v. Baptiste, 94-1218 (La.App. 3d Cir. 3/1/95), 651 So.2d 943.