# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-30891

DENNIS LUTHER, JR.,

United States Court of Appeals
Fifth Circuit

**FILED**
April 30, 2015

Lyle W. Cayce
Clerk

Plaintiff–Appellee

v.

JOHN W. STONE OIL DISTRIBUTOR, L.L.C., in personam,

Defendant

LARRY CURTIS, APLC; LAWRENCE N. CURTIS, also known as Larry Curtis,

Intervenors–Appellants

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:11-CV-1184

Before JONES, BARKSDALE, and PRADO, Circuit Judges.

PER CURIAM:*

Intervenor–Appellant Larry Curtis provided legal services to Plaintiff–Appellee Dennis Luther, Jr. as Luther pursued a maritime personal-injury claim against his employer, Defendant John W. Stone Oil Distributor, L.L.C.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-30891

("Stone"). Before any formal legal proceedings began, Luther discharged Curtis as counsel and retained the Cao Law Firm in his stead. The Cao Law Firm filed suit and prosecuted the case to settlement. Curtis intervened to seek a share of the contingency fee based on the retainer contract he had signed with Luther. The district court awarded Curtis his expenses but no part of the contingency fee, concluding that Curtis's services did not aid in the resolution of the suit. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On January 4, 2011, Luther retained Curtis, of the law firm Larry Curtis, APLC, to sue his employer, Stone, for personal injuries he suffered while working aboard one of Stone's vessels. Curtis and Luther entered into a retainer contract securing Curtis a contingency fee of "33 1/3% of whatever gross amount is collected by settlement, conference, and/or negotiation before the suit is filed" or "40% after filing suit, or litigation in any manner whatsoever, including appeal."

Between January and May 2011, Curtis billed approximately 31–32 hours of work on Luther's case. He met with Luther; advanced living expenses to Luther; made telephone calls to Luther's landlord and gym; obtained Luther's medical records, employment records, and income-tax returns; conducted medical research; and contacted a prospective expert witness.[1]

---

[1] Curtis's correspondence with the expert, Dr. Shira Kramer of Epidemiology International, reflects that Curtis was attempting to build a case before filing suit:

> The reason I am writing to you . . . is to determine, *first*, if you will be available to participate with us in this case, at the very least, to provide litigation support as we begin to work toward developing the pertinent facts, and, *second*, to advise us about what precisely you will require to formulate opinion(s) about the relationship . . . between certain CTD disorders . . . [and] overhead work with vibrating hand tools . . . .
>
> We are very early in the case—in fact suit has not yet been filed—though, we look forward to hearing from you about the subject matter of this letter at the earliest time.

No. 14-30891

However, he neither notified Stone of his representation nor filed suit on Luther's behalf.

On May 2, 2011, without prior notice to Curtis, Luther met with Ryan E. Beasley Sr. of the Cao Law Firm. As a result of this meeting, Luther decided to terminate Curtis's representation and retain the Cao Law Firm to prosecute his claim. The retainer contract between Luther and the Cao Law Firm had a contingency-fee provision nearly identical to that between Luther and Curtis— one-third of the recovery in the event of settlement and forty percent if the case proceeded to trial. The same day, Beasley sent a letter to Curtis, informing him that Luther had terminated his services and requesting that he forward "all file materials relating to [Curtis's] representation" of Luther.

Although Luther never provided testimony or an affidavit explaining his reasons for discharging Curtis, Beasley claimed that Luther expressed "concern[] that his case was not progressing" and "complain[ed] that he was having difficulty contacting [Curtis]." Curtis contests this characterization, implying that he was consistently responsive and noting that "Luther never— ever—voiced any dissatisfaction concerning the manner in which his case was being handled." In any event, the Cao Law Firm filed suit and performed all of the substantive work associated with Luther's claim, leading to a negotiated settlement of $280,000. While there is evidence that Curtis remained in intermittent contact with Luther's new attorneys as the case progressed, the record reflects that Curtis did not give his files to the Cao Law Firm. Indeed, the Cao Law Firm has consistently alleged that Curtis did not respond to its requests for Luther's client file—or, indeed, to any substantive correspondence—and Curtis has never affirmatively disputed this charge.

In January 2012, Curtis filed an unopposed complaint in intervention, requesting a share of any contingency fee recovered by Luther's attorneys as well as reimbursement for the expenses he incurred in representing Luther. In

No. 14-30891

March 2014, following settlement, Curtis filed a brief in support of his request for fees, asserting that he had been discharged without cause and was "entitled to no less than one-third (1/3) of the contingent professional fee," plus $11,894.84 in expenses. The Cao Law Firm challenged Curtis's request, averring that "[n]one of the actions undertaken by Mr. Curtis resulted in Mr. Luther's recovery" or "benefitted [Luther] in any way."

Upon referral from the district court, the assigned magistrate judge issued proposed findings and recommendations on Curtis's complaint in intervention. Applying the Louisiana Supreme Court's opinions in *Saucier v. Hayes Dairy Products, Inc.*, 373 So. 2d 102 (La. 1979), and *O'Rourke v. Cairns*, 683 So. 2d 697 (La. 1996), the magistrate concluded that: (1) Curtis had been discharged for cause due to nonfeasance; (2) Curtis was not entitled to any portion of the contingency fee because he "did not perform services . . . which played a significant, nor minimal part in the settlement of Luther's case"; and (3) Curtis could not recover his expenses because he had not adequately substantiated the charges.

Curtis objected to the magistrate's recommendations. He appended his billing records and his litigation file to the memorandum in support of his objections. The district court construed Curtis's objections as a motion for reconsideration under Federal Rule of Civil Procedure 59(e) and referred the matter back to the magistrate. The magistrate declined to reconsider its findings that Curtis had been discharged for cause and that Curtis was entitled to no portion of the contingency fee, but it elected to reconsider its ruling on Curtis's expenses and awarded Curtis $10,664.55. The district court impliedly adopted the magistrate's findings by entering judgment for Curtis in the amount of $10,664.55. Curtis timely appealed.

No. 14-30891

## II. JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction over Luther's suit pursuant to 28 U.S.C. §§ 1331 and 1333 and had jurisdiction over Curtis's claim in intervention pursuant to 28 U.S.C. § 1367(a). This court has jurisdiction to review the district court's final judgment pursuant to 28 U.S.C. § 1291.

As it adopted the magistrate's findings and recommendations *in toto*, we review the district court's findings of fact for clear error and its legal determinations de novo. *See City of Alexandria v. Brown*, 740 F.3d 339, 350 (5th Cir. 2014). If, however, the lower court applied the wrong legal standard when rendering its factual findings, we review these findings de novo. *Id.* A factual finding is clearly erroneous if it "is without substantial evidence to support it, the court misinterpreted the effect of the evidence, or this court is convinced that the finding[] [is] against the preponderance of credible [evidence]." *Id.* at 350–51 (first and second alterations in original) (quoting *Bd. of Trs. New Orleans Emp'rs Int'l Longshoremen's Ass'n, AFL–CIO Pension Fund v. Gabriel, Roeder, Smith & Co.*, 529 F.3d 506, 509 (5th Cir. 2008)) (internal quotation marks omitted). To reverse for clear error, we must be left with "a definite and firm conviction that a mistake has been committed." *Id.* at 351 (quoting *Bd. of Trs.*, 529 F.3d at 509) (internal quotation marks omitted).

When reviewing questions of state law, we look to the law of that state's highest court. *Id.* In the absence of a final decision by the state supreme court, we are obligated to make an *Erie* guess as to how that court would resolve the case before us. *Id.* To this end, "we defer to intermediate state appellate court decisions 'unless convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Hermann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 558 (5th Cir. 2002). Further, we are bound by our own published, prior interpretation of state law—our *Erie* guess—unless a subsequent state-

## No. 14-30891

court decision or statutory amendment renders our ruling "clearly wrong." *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 462–63 (5th Cir. 2010).

### III. DISCUSSION

Curtis raises three claims of error. He contends that, first, the district court miscalculated the highest ethical contingency fee to which Luther agreed; second, the district court erroneously found that he had been discharged for cause; and third, the district court wrongly concluded that he was entitled to no share of the contingency fee awarded to the Cao Law Firm. We address only the third point, as its resolution is dispositive of this appeal.

Under Louisiana law, when two attorneys provide legal services to the same client on a contingency-fee basis and one attorney is discharged before the case is resolved, the client is obligated to pay only one contingency fee that the court allocates between the attorneys. *See Saucier*, 373 So. 2d at 118. The amount of the fee is "determined according to the highest ethical contingency percentage to which the client contractually agreed in any of the contingency fee contracts which he executed." *Id.* And the apportionment of the fee between the attorneys is based on the factors listed in Rule 1.5 of the Louisiana Rules of Professional Conduct, which together are directed at assessing the reasonableness of a fee. *See id.* at 116, 118.[2] The factors (commonly known as "the *Saucier* factors") include, *inter alia*, "the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly"; "the amount involved and the results obtained"; and "the nature and length of the professional relationship with the client." La. R. Prof'l Conduct 1.5; *accord Saucier*, 373 So. 2d at 116. The purpose of applying these factors is to ensure that the fee is divided "according to the

---

[2] In *Saucier*, the Louisiana Supreme Court applied Disciplinary Rule 2–106 of the Code of Professional Responsibility, the precursor to Rule 1.5 of the Rules of Professional Conduct. 373 So. 2d at 116, 118.

No. 14-30891

respective services and contributions of the attorneys for work performed and other relevant factors." *Saucier*, 373 So. 2d at 118.

If the first attorney was discharged without cause, then the application of the *Saucier* factors marks the end of the analysis. *Id.* at 118. If, however, the first attorney was discharged for cause, then the court must next "consider the nature and gravity of the cause which contributed to the dismissal and reduce by a percentage amount the portion discharged counsel would receive after the *Saucier* allocation." *O'Rourke*, 683 So. 2d at 704. A finding that the *Saucier* factors entitle the first attorney to no part of the contingency fee renders irrelevant the remainder of the analysis. *See id.* The apportionment of contingency fees is a factual determination reviewed for clear error. *See Osborne v. Vulcan Foundry, Inc.*, 96-1849 (La. App. 4 Cir. 9/3/97), p. 3; 699 So. 2d 492, 494.

As this court has interpreted *Saucier* and *Osborne*, an attorney's representation must "advance [the] client's case" and have some "productive value to [the] client" in order for the attorney to recover any part of the applicable contingency fee. *See City of Alexandria*, 740 F.3d at 351–52. This is a "threshold issue." *Id.* at 352.

In *City of Alexandria*, we reviewed a district court's determination that a member of a team of attorneys retained by a municipality in litigation against an energy company was entitled to no fees. *Id.* at 342, 344, 348. The attorney, Brown, claimed that she investigated the city's claims against the company, "help[ed] to convince the City to file suit," kept the City Council apprised of the status of the litigation, discussed the matter with co-counsel and the City Attorney, and participated in the selection of a consultant and an auditor. *Id.* at 344. Brown also reviewed filings in the case but admitted that she made no written contributions to the team's submissions. *Id.* Apparently based on post hoc calculations, Brown claimed 1,650 billable hours for her work—an average

of approximately 12–15 hours per week. *Id.* at 348. Brown was terminated from the representation for insubordination, using client information to the disadvantage of the client, and taking actions adverse to the client. *Id.* at 345, 348. The district court awarded Brown no fees despite her 10% contingency-fee contract. *Id.* at 343, 348. The court found that Brown had been discharged for cause and concluded that "[w]hat 'work' she did was essentially nonproductive, and certainly did not contribute anything of substantial value even while she was employed." *Id.* at 348.

We affirmed the judgment. *Id.* at 352, 354. We explained that the district court's factual determination that Brown's work had "no productive value to her client . . . present[ed] Brown with a threshold issue that she need[ed] to address before she [could] successfully raise her legal challenges" to the district court's analytical framework. *Id.* at 352. Brown was unable to surmount this obstacle—we found no clear error in the district court's finding that Brown's services were devoid of value to her client. *Id.* at 353–54. We emphasized "the lack of any work product demonstrating Brown's contribution to the case," "the presence of co-counsel who apparently did nearly all, if not all, of the work," and the evidence that Brown's actions were "counterproductive." *Id.*

Similarly here, Curtis claims error in the district court's factual finding that he was entitled to no share of the contingency fee. He first asserts that "the fact that [he] did not file pleadings during his representation of Luther seems to have completely supplanted the analysis of the *Saucier* factors." To the extent Curtis aims to identify a legal error that would preserve de novo review of the lower court's findings of fact, his argument is unpersuasive. Review of the magistrate's reports and recommendations confirms that the magistrate applied the relevant *Saucier* factors and concluded that Curtis expended a limited amount of time on the case and "did not advance Luther's claims." Although Curtis is correct that "filing or not filing pleadings is not a

dispositive factor in whether an attorney is entitled to fees," his position rests on the implicit assumption that the discharged attorney has satisfied his ethical obligation to share his work product with his successor—an assumption that does not hold here. *See* La. R. Prof'l Conduct 1.16(d) ("Upon written request by the client, the lawyer shall promptly release to the client or the client's new lawyer the entire file relating to the matter.").

As noted above, the Cao Law Firm has consistently maintained that Curtis failed to comply with its repeated requests that he forward his client's litigation file, and Curtis has never controverted this claim—either before the district court or on appeal. Moreover, Curtis has pointed us to no authority providing that an attorney who fails to release his client file, and whose work therefore requires wholesale duplication by replacement counsel, is entitled to a share of the eventual recovery based exclusively on his pre-discharge activity. Nor, for that matter, has Curtis distinguished *City of Alexandria* or identified any Louisiana law that renders our opinion in that case "clearly wrong," *Bustos*, 599 F.3d at 463. As a result, we conclude that Curtis has shown no legal error, and our review of the district court's factual findings is for clear error. *See City of Alexandria*, 740 F.3d at 352; *cf. Tran v. Williams*, 10-1030 (La. App. 3 Cir. 2/9/11), p. 9; 56 So. 3d 1224, 1230 (finding no legal error in the trial court's fee-allocation ruling despite the fact that the court "did not annunciate the *Saucier* factors it used in reaching its determination" because "the information for an analysis for each of the factors listed was readily available to the trial court").

Under this heightened standard of review, Curtis bears the burden of proving that the district court's finding that his services provided no compensable value to Luther "is without substantial evidence to support it." *City of Alexandria*, 740 F.3d at 350. This he cannot do. As in *City of Alexandria*, Curtis states that he investigated Luther's claims and essentially helped

convince Luther to file suit against Stone, but he can point to no work product that actually contributed to the resolution of Luther's claims. *See id.* at 353–54. While Curtis may have represented Luther competently during the four months that their retainer agreement was in effect, his apparent refusal to share his work product with the Cao Law Firm deprived his work of all value to Luther once Luther retained new counsel.

Contingency fees, by definition, are dependent on the *result* of the representation. *See Saucier*, 373 So. 2d at 105 ("A contingent fee contract is a contract for legal services in which the attorney's fee depends upon success in the enforcement of the client's claim."). Curtis presents no evidence that his pre-discharge work actually *contributed to the outcome* of Luther's suit; to the contrary, the record suggests that Curtis's conduct was, at best, akin to an aborted investigation and, at worst, affirmatively counterproductive, *see City of Alexandria*, 740 F.3d at 354. Insofar as Curtis attempts to invoke his correspondence with the Cao Law Firm as evidence of his continued collaboration with Luther's new counsel, his efforts are unavailing: the record contains no indication of the substance of these conversations, and what does appear suggests that Curtis was nonresponsive. On this record, we cannot say that we are left with "a definite and firm conviction that a mistake has been committed," *id.* at 351 (internal quotation marks omitted), and Curtis cannot overcome the "threshold issue" that his services neither advanced Luther's case nor provided any "productive value" to Luther, *see id.* at 352. Curtis has recouped his $10,664.55 in documented expenses; he cannot also lay claim to the contingency fee that the Cao Law Firm alone earned.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.